Worldwide Home Products v. Time. Mr. Sonnebend, please proceed when you're ready. Thank you, Your Honors. May it please the Court, my name is Jeff Sonnebend. I am appellant in this case, actually. As the Court knows, this appeal is taken without opposition. Let me understand, there's three appeals here. Do you really have the ability to assert three separate appeals, or are you just appealing from the sanctions order to the extent that it applies to you? Yeah, I'm not sure I follow the question. The only thing on appeal here is the sanction order itself. Perhaps the issue is this, the sanction order is premised on a finding of inactive conduct, and solely on that finding. That finding is in clear error. I'm just trying to clean up procedurally, because we still have three separate appeals on the books here. So you don't claim that you could appeal from the underlying judgments, do you? The underlying judgment being the underlying judgment on the motion for summary judgment, yes. But procedurally, I'm not sure I'm following the Court's question. We have three docket numbers, right? Correct. And the three docket numbers, I think, correspond to an appeal from the sanction order, the April whatever it is, from the judgment of unenforceability, and from the denial of intervention. I think what we're trying to figure out is, do you agree that numbers two and three, the judgment of unenforceability and the denial of intervention, you don't have a present argument at least? I have no concern. No concern to me. So it's the sanctions order, and to the extent that the sanctions order was predicated on inequitable conduct, you think we can consider the merits, even if we can't set aside that judgment? I guess what this means is you could be successful, and the sanction order against you vacated, but the patent is still unenforceable because the parties with interest in that didn't appeal. That could be the result. It would be an odd result, Your Honor, because if the sanctions against me was based on inequitable conduct, and that same inequitable conduct finding is what caused the patent. But you don't have standing to appeal inequitable conduct as it applies to the patent. You only have standing to appeal it as it applies to the sanction order imposed against you personally. You have no stake in the patent, correct? I have no stake in the patent, and so if that's a distinction that procedurally is important, then I agree with it. It would be an odd outcome, but again, my horse in this race is just the inequitable conduct finding. Can I ask why the parties have settled? But I understand the settlement is somehow, there's some contingency about how much money is paid based on your appeal. So if I wasn't supposed to reveal that, you should tell me, because sometimes I don't want to misspeak and reveal anything confidential. But to what extent are you on the hook still in order to create standing here for anything, or have all of the damages been paid by the parties? No, they've not all been paid by the parties, and that is an important distinction. That's an important point. I am still personally on the hook, and in fact, I've made payment to counsel for defendants. That money's being held in escrow. That money would be returned to me when my name is cleared. This is not just about a formal reprimand where the parties paid all the fees. You actually are on the hook for money now. Oh, absolutely, and like I said, the money is in possession of opposing counsels in escrow. The sanctions, we believe, are incorrect. The sanction order is an error, and that's what's on appeal. If we were to conclude that the sanctions order was in error because the court didn't have an appropriate predicate as it related to inequitable conduct, would it be appropriate for us to remand so that the court could determine whether or not there was an alternative basis for a sanction? I don't believe so. I don't believe there's anything on the record that would leave that open. The court's finding of inequitable conduct was based The court's sanction was based solely on the finding of inequitable conduct. Well, if the case is, in fact, settled, would there even be an ability for us, I guess? Is there a case or controversy any longer that would afford remanding for consideration of other issues? Well, there is a case or controversy. The case or controversy for jurisdictional purposes, for constitutional purposes, is the sanction order. It's alive and well, and I'm living with it. That's real, and there's money on the line. I mean, it's as real as it gets. Whether beyond that, if the court decided, and I think this is really an academic question, but if this court decided to remand, would there still be a case or controversy? I think the answer is yes, because a sanction order is an order. It is, in and of itself, an order that has life. I mean, it is a case or controversy into itself, and that's the thing about sanctions, and the thing I think this court has wrestled with in cases like the Nissus case and the Tesco case, is that when a judge sanctions an attorney, the judge has now pulled this attorney into the case, and the attorney is now a participant in the case himself. That is a case or controversy. It's not the standard front door that a case or controversy normally walks into the court, but it's a case or controversy. Why don't you move on now to the merits? Why do you think that the judge got the inequitable conduct determination wrong? Well, actually, I came today, even though this is unopposed, because it's important, and I wanted to be here in case there were issues that arose. I think the papers are pretty clear. To summarize, the finding of inequitable conduct was based on the failure to disclose purportedly information about hangar B, the 90610 model number. I think we got the model number wrong. We want to use 601 and 610 because that actually distinguishes, whereas the first two digits don't. 601 and 610. I knew one was 01 and one was 10. 01 is the one that the PTO had. 610 is the one that you either had photographs of and or, I guess, actually some hangars. And Judge Taranto, that in right there, in a nutshell, you've summed up what the issue is. There were two hangars. Were those models different with respect to what's actually relevant to the patent? There was evidence in the record that there were. That's the testimony of worldwide home products. They were different in the relevant respects? They were different in relevant respects. Why is it that everyone didn't catch the difference, including you? Well, because they looked very similar. And the feature that was at issue was similar. They came from different molds. These are injection molded products. And Bob Doherty, in his deposition, and it's cited in one of the footnotes in the brief, said, hey, we had this 610 model, the physical model, the one that was supposedly withheld. I mean, it was withheld from the patent office. And when we put them together, they did not apply. But even if it had the same feature, the fact that it was a different product renders it statutorily non-prior art. Well, suppose that, and correct me if I'm wrong, I thought that the district court found this, that they were, in the respect at issue in the PTO, they were structurally the same. Suppose even for a moment, and we'll get back to another point, but suppose for a moment that the 610 was not prior art. Nevertheless, the PTO examiner had the 601, a very difficult to decipher photograph. If you had with you something that, although it was not prior art, you understood to be structurally the same, why is it not material to give the examiner a much clearer view of what the examiner already had in front of him? Namely, a picture of something that in the relevant respect is the same as what he had in front of him, but couldn't see very clearly. Well, because I think there's built into that question a faulty assumption, and that is that it's the same thing. Even if the structure looks the same, even if it's a very similar hanger, similar enough that people looking at pictures of it got confused. And there are things you can look at and say, oh, they really are different. There are structural differences. Once you point to that, they're obvious. But even if you assume they're very similar, it's still a different reference. And so the fact that this later thing that came from a different injection mold has a very similar design, and may do this, it may do that, it may have all these features, doesn't mean that it teaches you anything about the prior one, even if they look really similar. But the way you got the hangers is because you ordered the 601s, right? Worldwide did. No, that's not correct, Your Honor. Off the website. No, that's not correct, Your Honor. My clients ordered whatever the current Merrick hanger was, and what was shipped was the sixth hang. Whether or not the 601 ever was a product that was shipped, we don't know. So when you received these hangers, you didn't look to see whether or not the 601 actually existed as prior? Correct. The client, and this is again in the record, the client did the best it could to figure out when the 601 was available for sale and called Merrick, and Merrick refused to provide any information. And it wasn't until a deposition was taken under the subpoena power of the court, a third-party deposition of Merrick, that it was determined which product was what and when what was available. And might I also direct this inquiry to, I think, what's a more important point in the context here. I believe I'm correct about the law. To this day, standing here before you, I believe that there is no obligation to disclose non-prior art or something not proven to be prior art in relation to other references that were disclosed. I truly believe that to be the law. If I'm wrong, and if there is some exception carved out for non-prior art that may or may not impact an examiner's view of prior art, then I'm wrong. But that doesn't mean that I intended to defraud the patent office. That doesn't mean I was trying to hide something. And this is what Therosense is clear on, amongst other points. But isn't there part of the problem that you affirmatively made a representation to the patent office that you couldn't tell from the image whether or not the hangers abutted each other? And then you get hangers that appear to abutt each other, and you don't then do anything to clarify that original representation. I'm not sure what the court would have me clarify. My client testified to this, and it's in the record. Remember, this is here before you on summary judgment. But you don't make anything of that, actually, in your brief. You don't say there's actually a triable issue here of intent or materiality. You treat this exactly as if it were a post-trial clear error review. And you also don't make anything of the sort of super high 1927 standard. Well, I think that I do discuss the fact that this was brought up on summary judgment. But I think in the end that's just icing on the cake. I mean, the bottom line is this could have been after a jury trial. And with this evidence, it's wrong. Isn't there evidence from which the district court could have concluded that the 610 was prior art? Wasn't there either a deposition or anyway some testimony that says, yeah, we started selling these things in 2004? No, and what happened was- Perhaps there's contrary evidence based on the invoices? No, actually the court said in its order on the motion for reconsideration said, this is never to this day, the 610 has never been shown to be prior art. So the court admits flat out that, yeah, I took a look at this, and we were all wrong about this. And to this day, the 610 hanger has never been shown to be prior art. But isn't the standard material information relevant to the examiner's decision? Not material prior art. In fact, that's the exact language that comes from every case. It's material information. And in this case, the examiner is trying to decide whether a piece of prior art in his possession abuts or doesn't abut, and he can't figure it out from a figure. And you've got a physical embodiment. At that point in time, and it might not be the exact same model number, but you have a physical embodiment, and Mr. Dougherty testified, quote, I ordered the same one shown in Exhibit 11. Exhibit 11 is the 601, and he thinks he ordered from the Merrick website the same one shown in Exhibit 11. I believe Exhibit 11 was the letter, Your Honor. Was the April 24 letter, 27 letter? It's at 610 on the record. I could pull it up, but in any event. Yeah, if that's the case, what happened was the photos that were shown to us in this letter from opposing counsel, they said this is the same hanger that was submitted to the Patent Office, and it was not. It was the 610. But you thought you were getting exactly the same thing. I did, Your Honor. I did. You thought you were getting the same thing, and you testified pretty much honestly to that effect early on. So at what point did you suddenly realize, oh, I don't have to turn this over to the PTO because it's not, in fact, the 01. When did you have the epiphany that it was a different model number? Because it seems like you changed course at some point, and the point at which it appears that you changed course on the record is really late. I never changed course, Your Honor, respectfully. I, from the very outset, and this is in my deposition, before we had clarified this whole 601, 610 issue, in my deposition, I said you had a physical hanger. I believe a physical hanger is a different reference under 102. It's a different reference than a printed publication. And you believe that even if the printed publication and the physical hanger are the same model number? I do, because you don't know when the hanger was available. And I still believe that to this day. You don't know when the hanger was available, so the printed reference shows what it shows, and the hanger shows what it shows. And maybe I'm misremembering, but does the printed reference, is that the kind of hard-to-see photo? It was the web printout. It was a low-res printout. So why is it, if you thought you now have a physical model, and you thought it was the same, and you know that the examiner can't make heads or tails of the piece of prior art he has, namely this quite murky photograph, how is it not material? The hanger itself, which at the time you thought was a hanger as shown in the photograph, and if the examiner had the hanger, he could see exactly what the hanger was doing in a way that he was having a really hard time seeing from the photograph. Because it was my belief then as it is now, and I explain this in detail, and it's in the record, it's in the papers in the motion to quash to this magistrate judge, it's in the rule 72 motion, and I discuss it in the brief. My understanding, and I still believe it's the case, is that printed publications are treated differently under the patent statute. I think it's still the same post-AIA, but certainly pre-AIA, printed publications are treated differently than physical embodiments. And so if the printed publication, what often happens in manufacturing, I think this is common knowledge, is that products will be announced, maybe they'll even be offered for sale prior to them being available. But doesn't American Calcar that the district court relied on stand for the proposition that you have to disclose everything relating to the same art to the extent that you have it? To the same art, and that's the key thing. In American Calcar, the facts are radically different. In American Calcar, the patent attorney, or the inventor rather, had a car that he'd gotten from Honda that had this multimedia system in it. It came with an instruction manual. He had it before he filed for the patent application. So he had the physical embodiment in front of him, and this is great because this illustrates my point. The physical embodiment showed him things that were not disclosed in the printed publication. He had both before the critical date, and it was all about the same reference. It was a manual on this particular product. He went to the patent office, and he disclosed information from the printed publication knowing that the product disclosed different things. And he didn't disclose anything about the product. But in American Calcar, it was the same product. The product had different teachings than the printed publication, and he selectively disclosed.  I never had the product to which some instruction manual applied. I got a product, came across my desk. I said, I don't know when this product came out. And so whatever this product teaches that may be different from the printed publication... Isn't the printed publication we're talking about a web page offering the hangar for sale? It's offering a hangar for sale. Ended up being a different hangar. But it's a picture, and that's exactly... It's a picture offering a hangar for sale, and you had the actual hangar, and there was a question about whether the hangar had all of the elements of the claim. Right, but it ends up it was a different hangar. My client said on the record... Let's put that part aside. Let's talk about what you did before the patent office, because at the time you thought it was the same hangar. And we still don't know that they really were different in material respects. Right. Putting that aside, you thought you had the same hangar. I thought I had the same hangar in front of me. But my understanding of the law, and Calcar... I believe American Calcar supports my position standing here today, that the product is different because it teaches different things from the printed publication. That's what American Calcar kind of hinges on. In American Calcar, he had a product that showed something different. It had a different teaching than the printed publication. Yeah, but the problem here is that the printed publication that you submitted was unclear, so you couldn't tell what it taught. It taught what it taught. It had a product that actually showed what it taught. But I disagree with that. It didn't. It didn't show what it taught, just like the product in American Calcar taught something different. So you're saying that you thought that the webpage that described the product that was for sale didn't actually teach what was exactly in the product. It taught differently, or it taught what it taught. And my thought process was that, based on cases like American Calcar that treats printed publications and the product as separate disclosures, and the statute too. I think maybe I'm understanding your argument, which I'd be honest with you, the argument helped because I didn't understand it before. But is your argument that, for example, if on a website you're looking at a picture of a hangar and you have absolutely no idea what type of material it's made out of, but the claim requires it to be made out of steel, and if you have a physical hangar and you actually broke it in half to look at what it's made out of inside, it looks like plastic on the outside. It turns out it's made out of steel. That the offer on the website doesn't in fact disclose a hangar made of steel. Correct. And if you get the hangar... But you have to disclose material information to the office. And sometimes information can be information even produced later in time about what was in fact on sale earlier in time. Absolutely. I agree. And so why doesn't this sort of fall into that scenario? I don't... You have a physical embodiment which shows what really was offered for sale on the website. See, that's the part where I don't think the record supports the question. We don't know... First of all, we know now, and this is because we know now that it was a different product. And the court even admitted, we don't know that this thing was prior art. But I will... It's possible that my interpretation of the law is wrong. But you still think it's reasonable and that's why you shouldn't have been dinged. Well, but it doesn't... This is a difficult thing to say, but even if I was completely out to lunch on this, and I don't think I was, but even if I was completely out to lunch on this, that under Theracense, under Kingsdown, that's not enough to yank the rug out from under me and to sanction me and to basically hang me out there as a pariah of inequitable conduct. If I made a mistake, if I was grossly negligent, so be it. But that's not enough to hang me out to dry. But the issue of an intent to deceive, we're supposed to make that determination ourselves? Well, the intent has to be the only reasonable inference, an intent to deceive. And even if there's an explanation, a contrary explanation, even if it ends up being grossly negligent in its incorrectness, grossly negligent in its incorrectness, that's still not enough for an intent to deceive. And I'll even put this to you, Your Honors. If it was my intention to deceive by withholding a reference that ends up not being prior art, maybe it could have been an intent to deceive that I was so inept that I failed even there because there was no prior art that needed to be disclosed. But to be clear, I do believe that American Calcutta actually supports what I'm saying. I think Judge Moore understands the issue here that a reference teaches what it teaches and nothing more. And that when I got this hanger, I didn't know that the hanger as opposed to this fuzzy ad was out there. I didn't know what was available. At the time, had the examiner cited the reference for as a printed publication or as evidence of a on sale or prior use? No, the examiner got it right. He cited it as a printed publication because that's what it was. Only as a printed publication. And I make this point in my brief to you, Your Honors. The examiner at first wouldn't consider the web page as prior art because we couldn't figure out when that was available. Apparently, he went to the Wayback Machine at some point and said that he found that it was available. And so he did cite that as a reference. Can I see if I'm getting some of these things fit together? There are two possible prior arts here. One is the printed publication. It doesn't matter what the product is like because the printed publication has to speak for itself. So the hanger itself can't be material to the interpretation of that document, period. And then, as it turns out, as luck would have it, there is actually no other piece of prior art, namely the 610 as a product because we don't know its prior. Correct. Anything further? I think we have to close on this one. Thank you, Mr. Sotoben. The case is taken under submission.